R. B. LEACH, APPELLANT, V. CLARENCE L. TREBER ET AL.,
APPELLEES.

82 N. W. 2d 544

Filed April 19, 1957.   No. 34140.

*Richards, Yost & Schafersman,* for appellant.

*Richard A. Dier,* for appellees.

Heard before SIMMONS, C. J., CARTER, MESSMORE, YEAGER, CHAPPELL, WENKE, and BOSLAUGH, JJ.

CHAPPELL, J.

Plaintiff, R. B. Leach, brought this action against defendants, Clarence L. Treber and Donna Treber, seeking recovery upon a certain unpaid promissory note allegedly executed and delivered to him for valuable consideration by defendants as C. L. Treber and Mrs. C. L. Treber. The instrument, dated June 9, 1955, and due 180 days after date, on December 9, 1955, was for the principal sum of $2,500 with interest at six percent until due, and nine percent from maturity until paid. Hereinafter, Clarence L. Treber will be called defendant and Donna Treber will be designated as Mrs. C. L. Treber. When speaking of them both, they will be called defendants.

Defendants' answers admitted execution and delivery of the note on or about the date thereof, but alleged that it was without any legal consideration which could give it validity and make it collectible, therefore nothing was due thereon. Plaintiff's reply was a general denial.

Jury trial was waived, and after trial to the court it rendered judgment which found for defendants and against plaintiff, and dismissed plaintiff's petition at plaintiff's cost. Thereafter, plaintiff's motion for new trial was overruled, and he appealed, assigning, insofar as important here, that the judgment was contrary to the evidence and law. We sustain the assignment. Concededly, the sole question presented is whether or not there was a legal consideration for the note. We conclude that there was.

It is now elementary that findings of a court in a law action in which a jury is waived have the effect of the verdict of a jury and judgment thereon will not be disturbed unless clearly wrong. Also, in testing the sufficiency of the evidence to support a verdict and judgment, it must be considered in the light most favorable

to the successful party, that is, every controverted fact must be resolved in his favor and he should have the benefit of every inference that can be reasonably deduced therefrom. On the other hand, as held in Trask v. Klein, 150 Neb. 316, 34 N. W. 2d 396: "As a general rule a party calling a witness vouches for his credibility and is ordinarily bound by any evidence he gives which is not contradicted or shown to be unreliable.

"A party who offers the evidence of a witness cannot subsequently object that it should not have been received or that it is insufficient to sustain a judgment based thereon.

"But where such evidence is contradicted, either expressly or by inference, by evidence which would justify the trier of facts in arriving at a different conclusion, the party offering it is not ordinarily concluded thereby."

Also, as concluded in Farmers & Merchants State Bank v. Kuhn, 125 Neb. 457, 250 N. W. 652, if from the undisputed facts different minds may not honestly reach different conclusions or draw different inferences without reasoning irrationally, the trial court should render judgment consistent with the facts. Further, as stated in that opinion: "* * * to constitute a consideration for the giving of a promissory note it is ordinarily unnecessary that any benefit result to the promisor, it being sufficient if the transaction results in trouble, injury, inconvenience, prejudice or detriment to the promisee; * * *." We also held therein that: "Good consideration for a promissory note may consist of money received by the maker or of money or property lent, advanced or returned by said payee to a third person at the instance of said maker and with her knowledge and consent." See, also, Vybiral v. Maly, 123 Neb. 436, 243 N. W. 268.

In Plaza Hotel Co. v. Hotel Stratton, 132 Neb. 396, 272 N. W. 224, we held: "In an action on a promissory note, the burden is on the defendant to establish the defense of want of consideration.

"It is not essential to a valid consideration that it should move to the promisor. It is sufficient if it causes a loss, disadvantage, or imposes a legal obligation upon the promisee." See, also, Johnson v. Hansen, 139 Neb. 428, 297 N. W. 643.

As stated in Plumbly v. Harvard State Bank, 133 Neb. 630, 276 N. W. 385: "The burden of proving want of consideration was upon plaintiff, the party alleging it. Farmers & Merchants State Bank v. Kuhn, 125 Neb. 457, 250 N. W. 652; Neslund v. Kinnan, 129 Neb. 279, 261 N. W. 358. 'Every negotiable instrument is deemed prima facie to have been issued for a valuable consideration; and every person whose signature appears thereon to have become a party thereto for value.' Comp. St. 1929, sec. 62-201. 'Value is any consideration sufficient to support a simple contract.' Comp. St. 1929, sec. 62-202. See, also, Cozad State Bank v. McLaughlin, 128 Neb. 87, 258 N. W. 36. 'There are two kinds of consideration,—that which confers a benefit upon the promisor and that which causes a detriment to the promisee. Either is a valid consideration which will support a contract.' United States Fidelity & Guaranty Co. v. Curry, 126 Neb. 705, 254 N. W. 430." See, also, In re Estate of Tynan, 142 Neb. 671, 7 N. W. 2d 628; Petersen v. Dethlefs, 139 Neb. 572, 298 N. W. 155.

As held in Elson & Co. v. Beselin & Son, 116 Neb. 729, 218 N. W. 753, and reaffirmed in Stanford Motor Co. v. Westman, 151 Neb. 850, 39 N. W. 2d 841: "Mutuality of obligation of both parties to a contract is not essential to effectuate a binding agreement where there is a separate valid consideration as an inducement to the agreement; * * *."

In Scottsbluff Nat. Bank v. Blue J Feeds, Inc., 156 Neb. 65, 54 N. W. 2d 392, we held that: "A negotiable instrument as between the parties requires a consideration the same as any other contract, and when there is no consideration, * * * such absence of consideration is a defense to such instruments.

"In order for a detriment to the promisee to constitute a valid consideration for a note or contract, it must have been within the express or implied contemplation of the parties and known to and agreed to by them."

As said in Restatement, Contracts, § 90, p. 110: "A promise which the promisor should reasonably expect to induce action or forbearance of a definite and substantial character on the part of the promisee and which does induce such action or forbearance is binding if injustice can be avoided only by enforcement of the promise."

Fender v. McCain, 144 Neb. 58, 12 N. W. 2d 541, and other authorities relied upon by defendants are entirely distinguishable upon the facts hereinafter recited and law applicable thereto.

In the light of the afore-cited rules, we have examined the record. In that connection defendants assumed the burden of establishing that there was no legal consideration for the note. In doing so, they called plaintiff as their own witness, thus vouched for his credibility and were bound by his material and relevant testimony because it was not contradicted or shown to be unreliable either expressly or by inference except by the mere conclusion of defendant who voluntarily, without any excessiveness, fraud, or imposition being shown by competent evidence executed and delivered the note, but now simply says that: "I received nothing for the note. * * * Well, I had no reason for signing the note. It was a stupid mistake."

The record discloses that the note was concededly executed on June 9, 1955, by defendant in a little cafe in Kearney. Plaintiff furnished the printed form thereof and concededly defendant in his own handwriting appropriately completed every blank space thereon and signed same. As agreed, he then took the note home in order to obtain Mrs. C. L. Treber's signature. There she signed it at her husband's request without asking or knowing what it was for but assuming that it was in connection with defendant's business. The next day,

in compliance with an agreement hereinafter set forth, defendant delivered the note to plaintiff, the payee therein. It was received in evidence without objection.

Evidence adduced by defendant discloses that plaintiff had a corporation known as "Convair Coach Corporation" which had been producing and selling house trailers in Fremont. Defendant, a graduate of the University of Wyoming as an architectural engineer, was employed in February 1953, when he was 26 year old, as production manager and later as purchasing agent for the corporation. His salary until May was $85 a week plus a production bonus of $10 a trailer. Thereafter it was $100 a week plus such a production bonus. That corporation had originally issued $7,000 of stock at par value of $100, but as plaintiff advanced more money to the corporation, $15,000 of stock therein was eventually issued, all of which was owned by plaintiff until in May 1954. That corporation appears to have been in good financial condition during 1953 and 1954, with its stock worth considerably more than $100 a share. On May 11, 1954, defendant purchased five shares of such stock from plaintiff for $2,000, and on December 23, 1954, plaintiff, in appreciation of defendant's efficient services, gave him two more shares. Thus plaintiff and defendants were sole stockholders, and each drew salaries therefrom.

During that period plaintiff conceived the invention of a hot water heater system for trailers. Subsequently, a corporation called the Weatherall System, Inc., was organized for the production and marketing of that product, and both plaintiff and defendant while employed by their Convair Coach Corporation devoted several months of their time to its development. A patent for the invention was ultimately granted. However, while this was being done by plaintiff and defendant, their Convair Coach Corporation became financially involved and ultimately insolvent, with a $12,000 first mortgage on its equipment, and about $24,000 of un-

secured open accounts owing and unpaid by it. In that situation, plaintiff and defendant started west, planning thereby at some point to arrange for production and marketing of their hot water heater belonging to Weatherall System, Inc. In doing so they stopped at Kearney and there, through the Chamber of Commerce, interested two financially responsible men in that project. However, such project did not develop, but at Kearney they did start a new corporation called Convair Mobile Homes, Inc., with which to produce and market trailers. Thus, through plaintiff's efforts defendant was given the position of director, production manager, and engineer for that corporation at a salary of $125 a week together with an interest of 75 shares of stock in such corporation if defendant voluntarily stayed with the corporation as such employee for 3 years. The agreement with regard thereto, executed by plaintiff, defendant, and the two Kearney men aforesaid on May 10, 1955, appears in the record. That agreement provided that plaintiff was to pay to the corporation $10,000 within 120 days after articles of incorporation were perfected, and devote his time and efforts to establish a production line, arrange for supplies, and set up a sales organization for the corporation, for which he was to receive 150 shares of stock in that corporation. Plaintiff devoted his services to that corporation for about 3 months but was unable to make the $10,000 payment when due, so the other two men, who under the agreement of May 10, 1955, were to each provide $7,500 cash and receive 75 shares of stock in that corporation, bought plaintiff out, and defendant was made president of that corporation.

In the meantime, plaintiff and defendant had talked about how much stock defendant should receive in the Weatherall System, Inc., as compensation for the extra engineering work he had performed in perfecting the invention, but no amount therefor had been definitely agreed upon. However, on July 19, 1955, following the

execution of defendants' note on June 9, 1955, defendant was issued 100 shares of original stock in Weatherall System, Inc. Certificate therefor was signed by plaintiff as president and defendant as secretary of that corporation.

After discovering that their Convair Coach Corporation had become insolvent as aforesaid, with suits threatened against the corporation, and that it was pretty hopeless to recover, pay its debts, and keep the corporation operating successfully, plaintiff and defendant discussed that situation on several occasions. Each of them agreed at all times that as persons of character that corporation's unsecured debts, created by them as its sole stockholders, should be paid by them as a moral obligation in order to successfully raise some money and promote their business interests in Kearney. In January 1955 they sent out a letter to all creditors indicating their intention, without binding themselves personally, to see that the corporation eventually would pay its obligations. They thereafter decided that after the first mortgage was satisfied, they would sell those assets remaining and pay unsecured creditors the proceeds therefrom as far as they would reach. That was done but there wasn't much left to pay such creditors. Confronted with that situation, and desiring to successfully get back into business with Convair Mobile Homes, Inc., in Kearney and make some money, plaintiff and defendant met in Kearney on June 9, 1955, where plaintiff was then employed by Convair Mobile Homes, Inc., at $100 a week and defendant was employed by that corporation at $125 a week. After having been together there during the day discussing the problem, they met in a little cafe in the evening. There one or the other or both of them figured out the percentages or shares of the amount of unsecured obligations owing by the Convair Coach Corporation which each should assume to pay in some appropriate manner. Thus they arrived at a figure of $4,000 as the share

thereof which defendants should assume by giving plaintiff a note for that amount. However, to do that defendant wanted plaintiff to guarantee that all unsecured creditors of that corporation would be paid in full by plaintiff. Plaintiff did not feel that he could go that far but agreed to personally pay a $3,000 note owing the bank in Fremont and certain other unsecured obligations amounting to some $14,000 if defendants would give him their note due in 180 days for $2,500, which would clear and release defendants from all responsibility for the unsecured obligations of their failed corporation and place that responsibility entirely upon plaintiff. That arrangement was then agreed upon by plaintiff and defendant, and pursuant thereto defendants executed and delivered their note for $2,500 to plaintiff who thereafter in reliance thereon and without dispute concededly performed his part of their agreement and paid $17,362.28 of their Convair Coach Corporation's unsecured obligations.

In the meantime, on August 5, 1955, at a stockholders' meeting whereat plaintiff and defendant, as sole stockholders, were present, it was moved, seconded, and unanimously carried, that the Convair Coach Corporation should be dissolved pursuant to law, and plaintiff should be appointed to act as liquidating agent should any future action be required. Whether or not such corporation was actually dissolved in compliance with law is not clearly shown. Thereafter, however, when defendants' note was due on December 9, 1955, and plaintiff sought payment thereof from defendant, he was informed for the first time that it would not be paid.

In the light of the authorities heretofore set forth and the undisputed evidence heretofore recited, we conclude that there was a valid legal consideration for the note and that the judgment of the trial court was clearly wrong. It should be and hereby is reversed and the cause is remanded. All costs are taxed to defendants.

REVERSED AND REMANDED.